FILED

JUN 0 4 2020

Clerk of the Appellate Courts
Rec'd By _____

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs March 4, 2020

## IN RE MICHAEL B., ET AL.

**Appeal from the Juvenile Court for Cheatham County**
**No. 2019-164          Phillip A. Maxey, Judge**

_____

### No. M2019-01486-COA-R3-PT

_____

This is a termination of parental rights cases. The trial court terminated Appellant mother's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) abandonment by an incarcerated parent by wanton disregard; (3) failure to substantially comply with the requirements of the permanency plans; (4) persistence of the conditions that led to removal of the children; (5) severe child abuse; and (6) failure to manifest an ability and willingness to assume custody. The trial court also found that termination of her parental rights was in the children's best interests. Discerning no error, we affirm and remand.

### Tenn. R. App. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which RICHARD H. DINKINS and THOMAS R. FRIERSON, II, JJ., joined.

Zackorie Suggs, Joelton, Tennessee, for the appellant, Amanda B.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Crystal M. Morgan, Ashland City, Tennessee, Guardian ad Litem.

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

## OPINION

## I. Background

Appellant Amanda B. ("Mother") is the biological parent of Michael B., II (d/o/b June 2016) and Layla B. (d/o/b August 2017) (together, the "Children").[2] Appellee Tennessee Department of Children's Services ("DCS") became involved with this family on or about May 22, 2018, after receiving a referral alleging that:

> Mother reports she left her subutex on the kitchen counter and baby took the medicine.[3] Mother reports her 8mg of subutex is [doctor] prescribed. Baby tested positive for subutex on urine screen. Mother has a 6 month old as well. Mother reports she is getting a divorce from the baby's father and is getting an order of protection from him.

On May 25, 2018, DCS filed a petition in the Juvenile Court for Cheatham County ("trial court") to have the Children declared dependent and neglected. In addition to the older child ingesting Mother's medication, DCS's petition averred that it was contacted, on May 24, 2018, by the Ashland City Police, who informed them that Mother had an outstanding warrant for violation of probation and was being arrested. Furthermore, DCS stated that, "[M]other admits to using marijuana three weeks ago and is prescribed Subutex." By agreement, the Children were placed in the custody of family member Alyssa B. However, on June 11, 2018, Alyssa B. advised DCS that Mother had taken the Children that morning after an argument between Mother and Alyssa B.'s paramour. DCS made contact with Mother, who explained that Alyssa B.'s paramour had threatened Alyssa B. with a knife. The Children were temporarily returned to Mother's custody. However, one week later, on July 10, 2018, the Children were removed again. According to DCS's July 12, 2018 petition for emergency custody, the events that precipitated the Children's second removal from Mother's custody were as follows:

> On 7/6/18, [DCS] became aware that the mother had been arrested and charged with possession of drug paraphernalia in Davidson County due to having a "rig" (drug needle) between her legs. This occurred on 6/23/18 and the mother was released from jail the same day. [DCS] attempted to make contact with the mother on 7/6 at the home but was unsuccessful. A child welfare check was attempted on 7/9/18, at the request of [DCS], by Ashland City Police Officers . . . but no one appeared to be home.
>
> [DCS] finally made contact with the mother on 7/9/18, via text, and she agreed to call [DCS] on 7/10/18. The mother agreed to meet [the DCS

---

[2] Michael B. is the Children's father. The trial court terminated his parental rights to both Children, and he has not appealed.

[3] Subutex is an opioid.

caseworker] . . . for [DCS] to see the children and perform a mouth swab. . . . [Mother failed to call as promised, and at] 4:33 p.m. [DCS] received a call (from a witness at the scene) where mother was traveling in her vehicle in Davidson County. [The DCS caseworker's] number showed up on mother's caller ID [because the caseworker had been trying to reach Mother all day]. The mother passed out while at a stoplight with the vehicle running and her foot on the brake. Both children were in the vehicle. The phone was then passed to first responders. [DCS] advised first responders of mother's limited known medical history and called Davidson Dispatch to have an officer at the scene give [DCS] a call.

According to the police report, Mother was found unconscious in the driver seat of the vehicle with the Children in the back seat. The vehicle was at a stop light, and Mother's foot was on the brake; however, the car was still in drive. Another motorist noticed the situation, put Mother's car in park, and notified authorities. When first responders arrived, Mother was given Naloxone (Narcan) and eventually gained consciousness. Mother admitted to using heroin, which caused her to overdose. Two unused syringes were found under the seat of Mother's vehicle. Later that night, the DCS caseworker spoke with Mother, who was in jail at that time. Mother admitted that she used heroin while caring for the Children at the same time she was supposed to meet with the caseworker. Mother was charged with driving under the influence ("DUI"), child endangerment, and unlawful use of drug paraphernalia. She pled guilty to DUI and to the lesser-included offense of attempted child endangerment. The drug paraphernalia charge was dismissed.

According to the record, Mother's criminal history began well before the foregoing incident. As early as 2014, Mother was charged with unlawful use of drug paraphernalia and theft. Even after the Children were removed from her custody, she was arrested on July 13, 2018 and again on August 10, 2018. These arrests stemmed from probation violations for failure to report. At trial, Mother explained that her failure to report was due to "multiple reasons," including drug use and lack of transportation. She was incarcerated from September 10, 2018 through December 10, 2018, and from February 28, 2019 through May 22, 2019. At the time of the hearing on DCS's petition to terminate her parental rights, Mother had an upcoming hearing scheduled for a charge of driving on a suspended license. The trial court entered a protective custody order on July 13, 2018. A guardian ad litem was appointed for the Children, and an attorney was appointed for Mother.

Mother was allowed visitation with the Children. However, according to the trial court's status order of October 22, 2018, "[M]other had shown up to visit the children under the influence and . . . a needle had fallen from her person in front of the therapist and children." Accordingly, the trial court suspended all visits and contact. By order of December 20, 2018, the trial court adjudicated the Children to be dependent and

- 3 -

neglected based on severe child abuse. Mother did not contest the allegations made in DCS's petition and agreed that the proof was sufficient.

DCS worked with Mother to develop two permanency plans. Under the July 23, 2018 plan, Mother was required to: (1) resolve all legal issues and comply with the terms of her probation; (2) complete an alcohol and drug assessment and follow all recommendations; (3) sign releases with providers; (4) complete a forensic psychological evaluation and follow all recommendations; (5) submit to random drug screens; (6) complete a parenting assessment and follow all recommendations; (7) provide proof of stable and safe housing; (8) notify DCS of any changes in contact information or address; (9) maintain contact with DCS; (10) attend all meetings, court hearings, and appointments for the Children; (11) provide proof of legal income; and (12) participate in supervised visitation twice per month. The trial court ratified the first plan and specifically held that Mother's requirements thereunder were reasonable and related to remedying the reasons for the Children's removal. According to the record, DCS provided Mother with an alcohol and drug assessment and a parenting assessment while she was incarcerated. It was recommended that Mother participate in alcoholics anonymous and complete parenting classes. However, on January 9, 2019, Mother failed a random drug screen and admitted to using amphetamines, cocaine, benzodiazepines, methamphetamine, opiates, and marijuana. Thereafter, Mother indicated that she wished to participate in inpatient treatment; to that end, DCS secured a grant-funded bed for Mother at a treatment facility. Mother was required to call and complete an assessment, which she failed to do. DCS also provided Mother with information on how to schedule a psychological assessment, but she did not do so.

Because Mother made no progress on her responsibilities under the first parenting plan, the substantive requirements remained unchanged in the second plan, which was developed on February 25, 2019. Mother signed the plan, which was ratified by the trial court. As with the first plan, the trial court found that the requirements under the second plan were reasonable and related to remedying the reasons for the Children's removal.

On April 9, 2019, DCS filed a petition to terminate Appellant's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) abandonment by an incarcerated parent by wanton disregard; (3) substantial noncompliance with the requirements of the permanency plans; (4) persistence of the conditions that led to the Children's removal; (5) severe child abuse; and (6) failure to manifest an ability and willingness to assume custody. Following a hearing, the trial court terminated Mother's parental rights on all grounds asserted in DCS's petition and on its finding that termination of her parental rights was in the Children's best interests. Mother appeals.

- 4 -

## II. Issues

We state the dispositive issues as follows:

1. Whether there is clear and convincing evidence to support at least one of the grounds relied upon by the trial court to terminate Mother's parental rights.

2. Whether termination of Mother's parental rights is in the Children's best interests.

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Furthermore, if the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Therefore, this Court "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

### IV. Grounds for Termination of Parental Rights

Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this

Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n. 14 (Tenn. 2010). Accordingly, we will review all of the foregoing grounds.

### A. Abandonment by Failure to Provide a Suitable Home

Tennessee Code Annotated Section 36-1-113(g)(1) authorizes termination of parental rights on the ground of abandonment as defined by Tennessee Code Annotated Section 36-1-102(1)(A)(ii):

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> \*\*\*
>
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

"A suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A suitable home requires "[a]ppropriate care and attention . . . to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, 2014 WL 2587397, at *9.

As set out in context above, Tennessee Code Annotated Section 36-1-102(1)(A)(ii)'s definition of abandonment requires DCS to make reasonable efforts to assist the parent to establish a suitable home. DCS's efforts to assist the parent "may be

- 7 -

found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal." *In re Kaliyah S.*, 455 S.W.3d 533, n. 34 (citing Tenn. Code. Ann. § 36-1-102(1)(A)(ii)).

In its order terminating Mother's parental rights, the trial court found that despite reasonable efforts by DCS, there was clear and convincing evidence to support termination of her parental rights on the ground of abandonment by failure to provide a suitable home, to-wit: "The Court finds that during the four months following removal of these children, and even today, [Mother] has [not] secured housing for [herself] or the children and . . . [has failed to make] reasonable efforts to secure housing even after services were provided by [DCS]."

Turning to the record, the Children were removed from Mother's custody on July 10, 2018. Following our review, it is clear that DCS's efforts to assist Mother in establishing a suitable home during the relevant four month period exceeded Mother's efforts. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c) ("The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]"). DCS developed a permanency plan, referred Mother to the necessary services providers, facilitated visitation with the children, and attempted to administer random drug screens. Despite DCS's efforts, Mother failed to remain in contact with DCS, failed to visit the Children, and failed to follow the recommendations of assessments addressing her drug use and lack of parenting skills.

At the hearing, Mother admitted that she was currently without housing and was "couch surfing." As discussed below, there was strong evidence to suggest that Mother continued her drug use up to the day of the hearing. At a minimum, Mother admitted that she was living with people who used illegal drugs. Furthermore, Mother accrued additional criminal charges during these proceedings. Based on the evidence, it appears unlikely that Mother will be able to provide a suitable home for the Children at any early date. Accordingly, we conclude that there is clear and convincing evidence to support the trial court's termination of her parental rights on the ground of abandonment by failure to provide a suitable home.

### B. Abandonment by and Incarcerated Parent by Wanton Disregard

Tennessee Code Annotated section 36-1-102 defines abandonment by an incarcerated parent as follows:

> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4)

months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv). Thus, a parent who was incarcerated during all or part of the four months immediately preceding the filing of the termination petition can abandon his or her children by engaging in conduct prior to the incarceration that shows a "wanton disregard" for the children's welfare. We note that courts are not limited to the four-month period preceding a parent's incarceration to determine whether the parent has engaged in conduct evidencing a wanton disregard for his or her children's welfare. *In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *3 (Tenn. Ct. App. Apr. 11, 2016); *see also* *Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009) ("parental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration"). However, incarceration itself is not grounds for the termination of a parent's rights, but courts consider the incarceration a "triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866.

In its order terminating Mother's parental rights, the trial court found:

12. [Mother] was in jail all or part of the four months immediately preceding the filing of the State's termination petition. Specifically, the Court finds that the State's termination petition was filed on April 9, 2019, such that the four months preceding the filing of the same began on December 9, 2018 and ended on April 8, 2019. Further, the Court finds that the mother was incarcerated Davidson County Jail on July 13, 2018 for one day, then again on August 10, 2018 for one day. The mother was incarcerated in the Wilson County Jail from September 19, 2018 through December 9, 2018 then transferred to the Davidson County Jail on December 18, 2018 for one day. The mother was then incarcerated again in the Davidson County Jail from February 28, 2019 through May 22, 2019.

13. The Court finds that, during the four months immediately preceding her incarceration, [Mother] failed to consistently visit with the children. In fact, the Court notes that during the four months immediately preceding her incarceration, the mother had five scheduled visitations and only attended one, which led to the suspension of visitation due to the mother being under the influence. . . .

14. The Court finds that the mother continued to violate the law and become re-incarcerated throughout the life of the case showing wanton disregard for the welfare of the children.

As set out above, the statute does not define "wanton disregard." *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005). Nonetheless, Tennessee courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d at 867-68. "Our courts have consistently held that an incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child." *Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005) (citing *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *Dep't of Children's Servs. v. J.S.*, No. M2000-03212-COA-R3-JV, 2001 WL 1285894, at *3 (Tenn. Ct. App. Oct. 25, 2001); *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000). Indeed, the enactment of Tenn. Code Ann. § 36-1-102(1)(A)(iv), *supra*, reflects the General Assembly's recognition that "parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that "[i]ncarceration severely compromises a parent's ability to perform his or her parental duties." *In re Audrey S.*, 182 S.W.3d at 866. "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).

Here, the record is replete with evidence of Mother's poor decision making. Mother's criminal record was entered as a trial exhibit. It shows a pattern of recidivism. From the record, it appears that Mother's inability to remain out of jail is the result of her decision to continue using illegal drugs. These Children were removed from her custody when Mother overdosed while driving with the Children in the vehicle, yet there is no evidence that Mother has made significant or lasting progress in addressing her drug issues. In fact, she failed the one drug test DCS was able to administer in January 2019. Although there is some evidence that Mother attempted detoxification at Vanderbilt, she admitted that she left the halfway house due to curfew restrictions. Mother's drug use has resulted in her inability to engage with the Children so as to form any semblance of a bond with them. Furthermore, it has resulted in her inability to provide them with even the most basic needs. As such, there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of abandonment by an incarcerated parent by wanton disregard.

### C. Failure to Substantially Comply with the Requirements of the Permanency Plan

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of failure to substantially comply with the requirements of the permanency plan. Tennessee Code Annotated Section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

"[T]he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.* As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*Id.* at 656-57. The Tennessee Supreme Court has explained that

> [s]ubstantial noncompliance is not defined in the termination statute. The

statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).

As discussed above, Mother's requirements under the permanency plans were to: (1) resolve all legal issues and comply with the terms of her probation; (2) complete an alcohol and drug assessment and follow all recommendations; (3) sign releases with providers; (4) complete a forensic psychological evaluation and follow all recommendations; (5) submit to random drug screens; (6) complete a parenting assessment and follow all recommendations; (7) provide proof of stable and safe housing; (8) notify DCS of any changes in contact information or address; (9) maintain contact with DCS; (10) attend all meetings, court hearings, and appointments for the Children; (11) provide proof of legal income; and (12) participate in supervised visitation twice per month. The trial court ratified the plans and held that the requirements thereunder were reasonable and related to remedying the reasons for the Children's removal; this finding is not disputed.

Concerning Mother's failure to substantially comply with the foregoing requirements, in its order terminating her parental rights, the trial court found:

> The Court finds that [Mother] submitted to initial assessments provided by [DCS] while [she was] incarcerated; however, [she] failed to complete the task by complying with the assessment recommendations.

> The Court finds that [Mother] failed to complete any of the tasks and responsibilities set out for [her] in the permanency plans, such that [she is] not in substantial compliance with the same, and [she has] not made consistent contact with [DCS] regarding any attempt to work on services on the plans.

The record supports the trial court's findings. Mother has not provided DCS proof of stable housing because she has not had stable housing at any point in this case. At the time of the hearing on the petition to terminate her parental rights, Mother stated that she was "couch surfing" and agreed that she did not have a stable home. In addition, there is no proof that Mother has provided support for the Children. At trial, Mother reported that she was working with a temporary employment agency and had interviews scheduled; however, she admitted that she had neither paid support nor provided any

necessaries or gifts for the Children since they were removed from her custody.

Mother also failed to consistently visit with the Children. Out of five scheduled visits, Mother attended one. At that visit, DCS reported that Mother exhibited strange behavior. She arrived at the visit, which took place at a McDonald's, without shoes. Mother also dropped a needle in front of the Children. At one point, she went to the restroom and returned with more energy, but appeared "nervous and antsy." Based on this incident, DCS recommended that Mother be drug tested prior to any future visits. However, because Mother failed to maintain contact with DCS, DCS had no opportunity to administer more than one drug test. As noted above, Mother failed the one drug test, which showed positive for myriad illegal substances.

Although Mother completed the initial assessments DCS provided while she was incarcerated, as found by the trial court, she failed to follow through with any of the recommendations. Mother failed to avail herself of the inpatient treatment DCS arranged. At trial, Mother claimed that she participated in a detoxification program at Vanderbilt in June of 2019. After being released from Vanderbilt, Mother testified that she lived at a halfway house for two weeks; Mother stated that she left the halfway house due to its "curfew requirements." Mother stated that she was attending narcotics anonymous meetings five times per week, but she provided no proof. Despite Mother's testimony that she was drug free, it was brought to the court's attention that Mother had arrived at the hearing with three syringes in her purse. Mother explained that the syringes had been put in her purse by a roommate. On further questioning, Mother admitted that she was staying with people who were using illegal drugs. In addition to the three syringes, Mother's purse contained an empty can of beer. When questioned, Mother admitted that she drank the beer "because [she] was nervous" about the hearing—this despite Mother's testimony that she was drug and alcohol free.

From the testimony and record as a whole, we conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of failure to substantially comply with the reasonable requirements of the permanency plans.

### D. Persistence of Conditions

The trial court also found that termination of Mother's parental rights was appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other*

*grounds* by *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. When the termination petition was filed, the ground applied as a basis to terminate parental rights when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. Ct. App. 2002). Here, the Children were removed from Mother's custody on July 10, 2018 and were subsequently found to be dependent and neglected based on Mother's arrest for DUI and child endangerment stemming from the overdose incident with the Children in the vehicle.

In its order terminating her parental rights, the trial court found:

> 29. The Court finds that the children have been removed from the legal custody of [Mother] . . . for a period of six (6) months or longer by a court

- 14 -

order at the initial stage of the underlying dependency and neglect proceedings. . . .

30. The Court finds that [DCS] removed the children from [Mother's] custody because of severe abuse committed by mother, illegal drug use; lack of stability, criminal activity, lack of basic necessities to meet the children's needs . . . .

31. The Court finds that the conditions that led to the removal still persist in the home that, in all probability, would lead to further abuse and neglect of the children and that there is little chance that those conditions will be remedied soon so that the children can be returned safely to the home. Continuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home.

The evidence supports the trial court's findings. Although Mother completed an initial alcohol and drug assessment, she failed to follow the recommendations. As a result, she continued to use illegal drugs and tested positive for amphetamines, cocaine, benzodiazepines, methamphetamine, opiates, and marijuana in January 2019. Even after she was released from jail in May 2019, Mother immediately resumed her drug use. Although she entered detoxification at Vanderbilt in June 2019, she failed to remain at the halfway house. Then, on the day of the hearing on the petition to terminate her parental rights, Mother arrived at the courthouse with three syringes and an empty beer can in her possession. Mother admitted to consuming the beer, but tried to explain the presence of the syringes by stating that they were put in Mother's purse by her roommate. In offering this explanation, however, Mother conceded that she was still associating or living with people who use illegal drugs.

Based on Mother's lack of progress during the pendency of this case, there is little likelihood that she will remedy the persistent conditions at any early date so as to make it safe for the Children to be returned to her custody. Given the likelihood that Mother is still engaged in drug activity, has no stable home, and no employment, we agree with the trial court's finding that continuation of the parent/child relationship would pose a substantial risk of harm to the Children or, at least, would diminish their chances of early integration into a permanent home. As such, we conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of persistence of the conditions that led to the Children's removal from her custody.

### E. Severe Child Abuse

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of severe child abuse. Tenn. Code Ann. § 36-1-

113(g)(4). Tennessee Code Annotated section 36-1-113(g)(4) provides that a ground for terminating parental rights exists if:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4). Tennessee Code Annotated section 37-1-102 defines "severe child abuse," in relevant part, as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(22)(A)(i).

By order of December 20, 2018, the trial court adjudicated the Children to be dependent and neglected and the victims of severe child abuse perpetrated by Mother. As discussed above, Mother overdosed while driving with the Children in the vehicle. Mother did not appeal the December 20, 2018 adjudicatory order, and it became final by operation of law. As such, the issue of whether Mother committed severe child abuse is *res judicata*. *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2010); *In re Heaven L.F.*, 311 S.W.3d, 435, 439-40 (Tenn. Ct. App. 2010) (holding that the doctrine of *res judicata* applies "to prevent a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding," when such finding has been made in a previous dependency and neglect action) (citing *State v. Tate*, No. 01-A-01-9409-CV-00444), 1995 WL 138858, at *5 (Tenn. Ct. App. March 31, 1995). Accordingly, we conclude that the trial court did not err in terminating Mother's parental rights on the ground of severe child abuse.

### F. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of a parent's parental rights when he or she

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination of parental rights was added to the statute effective July 1, 2016. *See* 2016 Tenn. Pub. Acts, c. 919, § 20. Concerning the substantive requirements to meet the burden of proof, in *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018),

- 16 -

we explained that, first, the petitioner must prove that the parent has failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioner must prove that placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

Concerning the first prong, i.e., whether the parent has failed to manifest an ability and willingness to personally assume custody and financial responsibility of the Child, there has been some disagreement in this Court regarding the measure of proof required to satisfy this burden. In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court held:

> As to the first prong [of Tennessee Code Annotated Section 36-1-113(g)(14)], the statute requires the party seeking termination to prove a negative: that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. Here, despite finding that the parents "ha[d not] failed to manifest a willingness to assume custody" and that the "parents want these children," the juvenile court concluded DCS proved by clear and convincing evidence this ground against both parents. The court based its conclusion on the finding that the parents "d[id not] have the ability" to personally assume custody of the children.

> In general, "statutory phrases separated by the word 'and' are usually to be interpreted in the conjunctive." *Stewart v. State*, 33 S.W.3d 785, 792 (Tenn. 2000). In the context of a "negative proof" connected by the word "and," a party "must prove that . . . all" of the listed items were not met. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 120 (2012).

> At oral argument, DCS urged that we interpret the word "and" in the disjunctive so that it only had to prove an inability or unwillingness of the parents to assume custody of the children. Our supreme court has "recognized that the word 'and' can also be construed in the disjunctive where such a construction is necessary to further the intent of the legislature." *Stewart v. State*, 33 S.W.3d at 792. But because "we generally presume that the General Assembly purposefully chooses the words used in statutory language," *id.*; *cf.* Scalia & Garner, *supra*, at 116 ("Under the conjunctive/disjunctive canon, and combines items while or creates alternatives."), and the presumption has not been rebutted, we decline to adopt DCS's interpretation here.

We conclude that Tennessee Code Annotated § 36-1-113(g)(14) could not serve as a basis for terminating Mother's and Father's parental rights. The proof at trial negated a required element of the statutory ground. The juvenile court found: "In this case, these parents definitely want to assume legal and physical custody of the children and are willing to assume financial responsibility for the children."

However, in the subsequent case of *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018), a panel of this Court parsed the conjunctive (as opposed to disjunctive) language used in Tennessee Code Annotated section 36-1-113(g)(14) and compared the statutory language to other similar statutes before holding that

> [u]pon consideration of the statutory language and the relevant legal authority, we hold that the first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child.

*Id.* at *14. This dispute continues in cases where a parent manifests a willingness to assume custody and financial responsibility but is simply unable to do so; however, this is not such a case. In cases, such as the one at bar, where the parent has manifested neither a willingness nor an ability to assume custody and responsibility, this Court has upheld termination of the parent's parental rights on this ground. *See, e.g., In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019) (noting both *In re Ayden S.* and *In re Amynn K.* but ultimately concluding that DCS presented sufficient evidence that "Mother was not able or willing to assume physical or legal custody of or financial responsibility for the Child"); *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9-10 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) (noting the split in authority but holding that it was unnecessary to choose one approach where the parent had manifested neither an ability nor a willingness to parent the child).

Turning to the second prong of Tennessee Code Annotated section 36-1-113(g)(14), i.e., whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," this Court has explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However,

- 18 -

the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

Here, the trial court found that Mother failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the Children and that placing the Children in her legal and physical custody would pose a risk of substantial harm to them, to-wit:

36. [Mother] . . . [has] failed to manifest, by act or omission, an ability and willingness to assume legal and physical custody and financial responsibility of the children. The Court finds that [Mother has] failed to visit the children and [has] not complied with the permanency plans. [She has] unaddressed substance abuse issues. [She has] taken no action to demonstrate [her] desire to have the children back in [her] home. [She does] not have sufficient income to support [herself] or the children. Further, [she is] without appropriate housing and lack[s] any form of stability.

37. The Court notes that [Mother] testified that [she] wish[es] to have the children returned to [her] care; however, [she] has [not] stepped up and shown any action that would show that [she is] willing and able to do so.

38. Placing legal and physical custody of the children with [Mother] would pose a risk of substantial [harm] to the children's physical and/or psychological welfare.

For many of the reasons discussed above, there is clear and convincing evidence to support the trial court's findings. Rather than taking advantage of the help DCS offered and working toward lasting adjustments in her lifestyle, Mother continued to use illegal drugs during the pendency of this case. As a result, she incurred additional charges and jail time, which made it impossible for her to obtain safe housing and stable employment. She failed to exercise available visitation with the Children and provided no support for them. In short, due entirely to her own poor decisions, she has failed to manifest an ability or willingness to assume custody or financial responsibility for these Children. We affirm the trial court's termination of her parental rights on this ground.

## VI. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). As the Tennessee Supreme Court explained:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d)(2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to this appeal, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has made such an adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent

or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support . . . .

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d at 194.

In its order terminating her parental rights, the trial court specifically considered each of the foregoing statutory factors and found that each weighed against Mother. Specifically, the trial court found that, under factor one, Mother has failed to make changes in her conduct or circumstances that would make it safe for the Children to go home. We agree. Mother has not addressed her substance abuse or parenting issues. She is without a home or job.

Concerning factor two, the trial court found that despite DCS's efforts to assist her, Mother has not made lasting changes or improvements to her situation. We agree. As discussed in detail above, Mother failed to avail herself of the opportunities presented by DCS. Rather, she continued to use drugs and to incur more criminal charges. Her

choice to do so has resulted in the continuation of her unstable lifestyle and her persistent inability to properly care for these Children. Furthermore, as to factor three, Mother has failed to visit with the Children despite numerous opportunities to do so. Moreover, as to factor nine, Mother has paid no support for the Children.

Concerning factors three and four, there is no evidence that the Children have any bond with Mother as she has been absent from their lives due to her own decisions. While Mother has continued to engage in criminal activity and drug use, the Children have found a safe and stable home with their foster family. According to the testimony, the Children have bonded with the foster parents and their extended family. Photos and testimony indicate that the Children's current environment is safe and stable, and all of their needs are being met. To remove these Children from the only stable home they have ever known would likely cause them severe emotional and physical distress.

As to the remaining statutory factors, Mother has previously placed these Children in danger by injecting heroin while (or shortly before) driving with the Children in the vehicle. This resulted in her overdosing in front of them. Such an event would cause most parents to address their drug use and make significant changes to their lifestyles. However, Mother has not done so. Rather, she has continued to use illegal drugs and has been in and out of jail during the pendency of this case. Mother has no stable housing and continues to associate with people who use illegal drugs. There is no evidence that Mother has any intention of making the necessary changes at any near date. For these reasons, we conclude, as did the trial court, that termination of her parental rights is in the Children's best interests.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Appellant's parental rights to the two minor Children. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Amanda B. Because Amanda B. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

KENNY ARMSTRONG, JUDGE

- 22 -